IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LIA MARIE LINGO, V.R.S., a minor
Child (Age 13), and J.P.L., a minor child
(Age 9),

          Plaintiffs,

          v.

CITY OF SALEM, a municipality, Salem
Police Officer STEVEN ELMORE, and
Salem Police Corporal JUSTIN CARNEY,
in their individual capacity and as police
officials for Salem,

          Defendants.
_____

Civ. No. 6:12-cv-01019-MC

OPINION AND ORDER

MCSHANE, Judge:

On June 13, 2010, Officer Steven Elmore (Elmore) responded to a non-criminal

neighborhood dispute at approximately 10:00 p.m. After speaking with one neighbor, Elmore

walked to the rear of Lia Lingo's (Lingo) adjacent residence. Elmore then entered Lingo's

carport and knocked on the back door located within. After the door opened, Elmore detected

marijuana emanating from the residence and spotted Lingo's minor child, J.P.L. Lingo informed

Elmore that she had two minor children in the home, V.R.S. and J.P.L. Elmore and Officer Justin

Carney (Carney) subsequently arrested Lingo without warrant for endangering the welfare of her

two minor children. V.R.S. and J.P.L. were then placed with Lingo's great aunt Ruth under

Oregon Department of Human Services (DHS) supervision for eight days.

1 – OPINION AND ORDER

This Court is asked to consider whether Lingo's seizure was lawful under the Fourth Amendment as selectively incorporated by the Fourteenth Amendment Due Process Clause. Because (1) the exclusionary rule and fruit of the poisonous tree doctrine do not apply under these circumstances and (2) defendants had probable cause to arrest Lingo for endangering the welfare of her two minor children, this Court finds that Lingo's arrest was lawful under the Fourth Amendment. Thus, plaintiffs' motion for partial summary judgment, ECF No. 30, is GRANTED IN PART and DENIED IN PART, and defendants' motion for summary judgment, ECF No. 35, is GRANTED.

## PROCEDURAL AND FACTUAL BACKGROUND

This action arises out of an alleged violative arrest and related seizures. On June 13, 2010, plaintiff Lingo contacted the Salem Police Department and asked that an officer advise her neighbor, Suzanne Tegroen, to "keep her dog that was leaping on my kids, pooping in my yard, out of my yard, [and] to keep her child off of the trampoline that was in my backyard." Decl. of Kenneth S. Montoya 11–12, ECF No. 38. Lingo was advised that no officers would be sent to settle the dispute. *Id*. at 12. Later that same day, Tegroen contacted the Salem Police Department regarding the same ongoing dispute. Decl. of Steven Elmore 3, ECF No. 37. At approximately 10:00 p.m., defendant Elmore was dispatched to Tegroen's residence at 2530 Lee Street SE regarding that dispute. *Id*.

Upon arrival at Tegroen's residence, Tegroen advised Elmore about the escalating problems. *Id*. In response, Elmore explained that "none of the issues . . . presented that night met the criteria of a crime, but that he would speak with Ms. Lingo about the ongoing problems." *Id*. After Tegroen pointed out Lingo's residence, Elmore departed Tegroen's residence which faced eastward and walked south along the unnamed street to Lingo's adjacent property. *Id*.; *see also*

2 – OPINION AND ORDER

Decl. of Steven Elmore 1, ECF No. 60 (photograph). Lingo's residence, unlike Tegroen's residence, faced westward towards 25th Street, but was accessible via a dirt driveway connecting to the unnamed street. *Id*.; Decl. of Dugan 1–3, ECF No. 32-2. Lingo's driveway led to an attached single-car carport enclosed on all sides except the entrance. Decl. of Dugan 1–3, ECF No. 32-2. Located within, but against the rear wall of this carport, was a door connecting to Lingo's residence. *See* Decl. of Lia Lingo, ECF No. 58 (compact disk).

Elmore, upon noticing that Lingo's rear outside light was on, entered Lingo's carport and knocked on the door located within. Decl. of Steven Elmore 4, ECF No. 37. Stephanie Moore, Lingo's acquaintance, answered the door and after a brief conversation, informed Elmore "that she did not live at the house and would get the owner." Decl. of Brian Michaels 4, ECF No. 33-1. Elmore immediately smelled what he recognized as marijuana emanating from the residence. Decl. of Steven Elmore 4, ECF No. 37.

Shortly thereafter, Lingo went outside and met with Elmore. *See* Decl. of Kenneth S. Montoya 14–15, ECF No. 38. Elmore introduced himself and informed Lingo that he was there regarding a neighbor dispute: a non-criminal matter. *Id*. at 15–17. Elmore then asked Lingo about the odor. *Id*. at 17. Lingo advised Elmore that he smelt a hemp-scented incense candle and not marijuana. *Id*. at 17, 21; Decl. of Brian Michaels 5, ECF No. 33-1. Lingo also informed Elmore that she did not have a medical marijuana card. Pls.' Second Am. Compl. 3, ECF No. 8; *see also* Decl. of Brian Michaels 5, ECF No. 33-1 (indicating that Elmore "conducted a records check through WEBLEDS and determined Lingo d[id] not have a medical marijuana card and the location [wa]s not a registered grow site."). Elmore, disbelieving that the scent emanated from a candle, repeatedly asked for consent to enter Lingo's residence. Decl. of Kenneth S. Montoya 17–18, ECF No. 38. Lingo refused to grant Elmore consent. *Id*. During this

3 – OPINION AND ORDER

conversation, J.P.L., Lingo's child, opened the door and peeped out. *Id.* at 13, 18. Elmore, having seen J.P.L., asked Lingo about minor children in the home. *Id.* at 18. Lingo then identified her two minor children, V.R.S., 11-years old, and J.P.L., 7-years old. *Id.*; Decl. of Brian Michaels 5, ECF No. 33-1.

Approximately one hour after Elmore's initial arrival at plaintiffs' residence, defendant Carney arrived. Decl. of Kenneth S. Montoya 20, ECF No. 38. Carney, having arrived at the carport, smelt what he believed to be fresh marijuana emanating from Lingo's residence. Decl. of Brian Michaels 5, ECF No. 33-1; Decl. of Brian Michaels 2, ECF No. 45-4. Elmore, after receiving Carney's opinion, asked again for consent to enter Lingo's residence. Decl. of Kenneth S. Montoya 22, ECF No. 38. Lingo again refused to grant consent. *Id.* Defendants then arrested Lingo for endangering the welfare of a minor, ORS § 163.575. Pls.' Second Am. Compl. 4, ECF No. 8. Lingo spent nearly 24 hours in jail before being released. *Id.*

Following Lingo's arrest, Elmore entered the residence and told V.R.S. and J.P.L. to get their shoes and coats. Decl. of Kenneth S. Montoya 23, ECF No. 38. Elmore accompanied V.R.S. into her room while she collected her jacket and shoes. *Id.* V.R.S. and J.P.L. then spent approximately 15 minutes sitting in the carport before they were placed in the back of Carney's police car. *Id.* at 25. Lingo, who at that time was placed in Elmore's police car, informed Carney that the children could likely be taken to either her mother's residence or her great aunt Ruth's residence. *Id.* at 26. Carney initially took the children to Lingo's mother's residence, but then subsequently took them to Ruth's residence. *Id.* at 28–29; Pls.' Second Am. Compl. 4, ECF No. 8. The children remained with Lingo's great aunt Ruth under DHS supervision for eight days. Pls.' Second Am. Compl. 4, ECF No. 8.

Elmore, having booked Lingo, subsequently submitted an affidavit to the Marion County Circuit Court, seeking authorization to inspect the residence and to "seize and analyze any controlled substance . . . . such as marijuana and user paraphernalia[.]" Decl. of Brian Michaels 3–7, ECF No. 33-1. Based upon Elmore's affidavit, Marion County Circuit Court Judge Claudia Burton issued the requested search warrant. *Id*. at 2. At approximately 4:20 a.m. on June 14, 2010, Elmore and Carney, along with three other Salem Police officers, conducted a search of Lingo's residence. *Id*. at 1. Pursuant to the search, the officers seized 1.8 grams of suspected marijuana, 10 used glass bongs, 10 small, unused Ziploc-type baggies, and 11 Klonopin prescription pills. *Id*.

## STANDARD OF REVIEW

This Court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id*. The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

## DISCUSSION

Defendants contend that: (1) issue preclusion is inappropriate regarding the lawfulness of defendants' initial entrance into plaintiffs' carport because defendants were not in privity with a party to the prior criminal-suppression hearing; (2) the arrest of Lingo was reasonable under the Fourth Amendment because probable cause existed to believe that she had endangered the welfare of a minor, ORS § 163.575; (3) the seizure of V.R.S. and J.P.L. was reasonable and warranted under the First, Fourth, and Fourteenth Amendments because defendants had reasonable cause to believe that both children were in imminent danger of serious bodily injury; and (4) plaintiffs provided insufficient evidence to demonstrate a violative policy or inadequate training under *Monell*. This Court addresses each argument in sequence.

## I. Issue Preclusion

Plaintiffs contend that because "[i]ssue preclusion applies" this Court should "rule as a matter of law that the defendant officers violated the Fourth Amendment in going to the rear door." Mem. in Supp. of Pls.' Mot. Partial Summ. J. 5, ECF No. 31.

This Court "begin[s] by considering the framework for analyzing when a state court decision has a preclusive effect on a federal proceeding." *White v. City of Pasadena*, 671 F.3d 918, 926 (9th Cir. 2012). "Under [28 U.S.C. § 1738], a federal court 'must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" *Id*. (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)).

 "Issue preclusion prevents parties from relitigating issues that were actually litigated and determined in a prior action." *State ex rel. English ex rel. Sellers v. Multnomah Cnty.*, 348 Or. 417, 431 (2010) (citing *Nelson v. Emerald People's Util. Dist.*, 318 Or. 99, 103–104 (1993)). In *Nelson*, the Oregon Supreme Court found:

6 – OPINION AND ORDER

If one tribunal has decided an issue, the decision on that issue may preclude relitigation of the issue in another proceeding if five requirements are met:

1. The issue in the two proceedings is identical.

2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.

3. The party sought to be precluded has had a full and fair opportunity to be heard on that issue.

4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding.

5. The prior proceeding was the type of proceeding to which this court will give preclusive effect.

318 Or. at 104 (citations omitted). The outcome in this case turns on the second and fourth requirements.

As to the second requirement, "[i]f a claim is litigated to final judgment, the decision on a particular issue or determinative fact is conclusive in a later or different action between the same parties if the determination was essential to the judgment." *N. Clackamas Sch. Dist. v. White*, 305 Or. 48, 53 (1988) (citations omitted). In Lingo's criminal case, *State of Oregon v. Lia Lingo*, No. 10C43921 (Or. Cir. Ct. Dec. 20, 2010), Judge Ochoa orally granted Lingo's motion to suppress "[f]or the reasons stated by the defense in this matter" after discussing defendants' entrance into plaintiffs' carport. Decl. of Brian Michaels 4, ECF No. 48-1.[1] In her memorandum

---

[1] Judge Ochoa found:

> What I think causes me to question the lawfulness of his decision to approach in the way he did is this is not a door that is set out - - well, again, houses are built, generally, where you have a front door that's usually toward a street and you have a back door. But this back door opens up into a carport, not directly to the outside . . . .
>
> You have to go through - - enter into a carport before you get to the back door. I mean, from the State's exhibits, specifically Exhibits 2 and 3 - - I mean, you have to look for it to make out a door there. It's not - - at least I can't easily ascertain it. I mean, if I didn't know one was there, I'd be hard put to say where the door was.

in support of her motion to suppress, Lingo relied in part upon federal law. In particular, Lingo argued that she "had a reasonable expectation of privacy" in the carport based in part, upon the standard articulated in *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). *See also State v. Campbell*, 306 Or. 157, 164 (1988) (distinguishing Oregon Constitution Article I, § 9 analysis from Fourth Amendment analysis). Although this Court has reservations about the sufficiency of Judge Ochoa's findings, *see supra* note 1, this Court finds them sufficient to meet the second requirement. *See, e.g.*, *State Farm Fire & Cas. Co. v. Reuter*, 299 Or. 155, 159–60 (1985) (finding that a jury's prior rejection of a criminal defendant's affirmative insanity defense was determinative in a subsequent declaratory judgment action).

As to the fourth requirement, "[a] person may be bound by a previous adjudication either by reason of being a party in the case, or by reason of participation which is substantially equivalent to having been a party, or from having a legal relationship that is derived from one who was a party." *State Farm Fire & Cas. Co.*, 299 Or. at 160–61 (citing *Gaul v. Tourtellotte*, 260 Or. 14, 20 (1971)). Privity "is neither rule nor doctrine; it describes a result." *Id*. at 162; *see also* RESTATEMENT (FIRST) OF JUDGMENTS § 83 cmt. a (1942).[2] Defendants Elmore and Carney, in reliance upon *Davis v. Eide*, 439 F.2d 1077, 1078 (9th Cir. 1971), contend that they are not in privity with a party to the prior proceeding, e.g., the Marion County prosecuting attorney. Defs.' Resp. to Pls.' Mot. Partial Summ. J. 2–7, ECF No. 43.

---

> The deputy could have easily walked down to where - - the front door where prevailing social norms would say you could go there without any kind of trespass.

Decl. of Brian Michaels 3–4, ECF No. 48-1.

[2] RESTATEMENT (FIRST) OF JUDGMENTS § 83 cmt. a (1942), in relevant part, provides:

> The word "privity" includes those who control an action although not parties to it (see § 84); those whose interests are represented by a party to the action (see §§ 85–88); successors in interest to those having derivative claims (§§ 89–92).

Although *Eide* is not binding,[3] this Court finds it persuasive. *See, e.g.*, *Skoog v. Clackamas Cnty.*, Civil No. 00–1733–MO, 2004 WL 102497, at *9 (D. Or. Jan. 12, 2004), *aff'd in part and rev'd in part on other grounds*, 469 F.3d 1221, 1230 (9th Cir. 2006). In *Eide*, the Ninth Circuit found:

> The defendants were city police officers not directly employed by the state; they had no measure of control whatsoever over the criminal proceeding and no direct individual personal interest in its outcome. In these circumstances there was no privity sufficient to invoke the doctrine of collateral estoppel.

439 F.2d at 1078 (citing *Williams v. Cambridge Mutual Fire Ins. Co.*, 230 F.2d 293 (5th Cir. 1956)). Consistent with *Eide*, defendants Elmore and Carney "did not have any measure of control [over] the Marion County prosecutor." Defs.' Resp. to Pls.' Mot. Partial Summ. J. 3, ECF No. 43. Defendants role "at the [preliminary] hearing was simply that of [witnesses] for the prosecution" and they "could not call witnesses, . . . direct the examination of the State's witnesses, . . . choose the counsel who represented the State at the suppression hearing[,] . . . [or] appeal the ruling once it was made." *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1106 (10th Cir. 1998) (citations and internal quotation marks omitted); *see also State v. Ratliff*, 304 Or. 254, 259 (1987) (noting that when "an [entity] . . . does not actively participate in certain species of proceedings, there is less reason to hold that [entity] or those that may be in privity with it . . . bound by the resolution of issues at the proceeding."). Moreover, defendants were employed by the City of Salem and not the State of Oregon, and had no direct, individual personal interest in the outcome of Lingo's case. *See, e.g.*, *Skoog*, 2004 WL 102497, at *9. Accordingly, this Court declines to apply issue preclusion. *Cf. Parklane v. Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979)

---

[3] In *Eide*, the Ninth Circuit considered whether a California appellate court decision—reversing plaintiff's criminal conviction for receipt of stolen goods—collaterally estopped defendants from disputing the existence of probable cause in a 42 U.S.C. § 1983 action against the police officers. 439 F.2d at 1078. Because this Court applies Oregon law in this matter, *Eide* is not binding.

("The general rule should be that . . . where . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.").

## II. Fourth Amendment

Plaintiffs assert two false arrest counts against defendants. To support these counts for false arrest, plaintiffs contend that (1) defendants' entrance into plaintiffs' carport and subsequent detection of marijuana constituted an unlawful search, and (2) defendants' arrest of Lingo, based in substantial part, if not completely, on illegally procured evidence, constituted an unlawful seizure.

## A. Search

The issue before this Court is whether defendants conducted a "Fourth Amendment search of [Lingo's] residence because they [smelled marijuana] from an unlawful vantage point." *United States v. Garcia*, 997 F.2d 1273, 1279 (9th Cir. 1993). This Court must first determine if defendants lawfully "enter[ed] into and through the carport, to the back door." Mem. in Supp. of Pls.' Mot. Partial Summ. J. 5, ECF No. 31. Second, this Court must determine whether defendants Elmore and Carney lawfully smelt what they perceived to be marijuana.

## i. Defendants' Entrance into Plaintiffs' Carport

"The Fourth Amendment, made applicable to the States by the Fourteenth, . . . provides in pertinent part that the 'right of the people to be secure in their houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .'" *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 (1992) (quoting *Ker v. California*, 374 U.S. 23, 30 (1963)). "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (citations and internal quotation marks

10 – OPINION AND ORDER

omitted). The term "houses" includes the area "'immediately surrounding and associated with the home'— . . . *curtilage*—as 'part of the home itself for Fourth Amendment purposes.'" *Id.* (emphasis added) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

The "curtilage question[] should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observations by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). Plaintiffs' single-car carport was attached to the backside of plaintiffs' residence and was accessed only by a driveway leading to an unnamed street. *See, e.g.*, Second Decl. of Dugan 1–4, ECF No. 59-1; *see also L.A. Police Protective League v. Gates*, 907 F.2d 879, 885 (9th Cir. 1990) (finding that an "attached garage" constituted curtilage for purposes of Fourth Amendment analysis). This carport, enclosed on all sides except the entrance, was used for storage of various household items. *See* Decl. of Dugan 1–3, ECF No. 32-2; *see also* Decl. of Kenneth S. Montoya 20 ECF No. 38 (indicating that Lingo had two blue recliner chairs in the carport); Decl. of Lia Lingo 2, ECF No. 58 (indicating that Lingo stored personal items in the carport). Plaintiffs accessed their home through a back door located within this carport. *See Gates*, 907 F.2d at 885 ("We note that an attached garage often even has a door leading directly into a room of the house."). This Court "therefore determine[s] that on the record before [it] [Lingo's] [carport] was entitled to the cloak of protection that was thrown over h[er] house." *Id*. Because defendants "had all four of their feet . . . firmly planted on the constitutionally protected extension of [Lingo's] home, the only question is whether [s]he had given h[er] leave (even implicitly) for them to do so." *Jardines,* 133 S. Ct. at 1415.

In *Jardines,* the Supreme Court found:

11 – OPINION AND ORDER

> A license may be implied from the habits of the country, notwithstanding the strict rule of the English common law as to entry upon a close. We have accordingly recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds. This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.

*Id.* at 1415–1416 (citations and internal quotation marks omitted). Consistent with the "license" analysis in *Jardines*, the Ninth Circuit recognizes the "so-called 'knock and talk' exception to the warrant requirement to justify [police] incursion into the curtilage [of a home]." *United States v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir. 2012). In *Perea-Rey*, the Court found:

> [I]t remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home.
>
> Officers conducting a knock and talk also need not approach only a specific door if there are multiple doors accessible to the public. [T]he law does not require an officer to determine which door most closely approximates the Platonic form of main entrance and then, after successfully completing this metaphysical inquiry, approach only that door. An officer [initiating] a knock and talk visit may approach any part of the building . . . where uninvited visitors could be expected.

680 F.3d at 1187–88 (quoting *United States v. Titemore*, 335 F. Supp. 2d 502, 505–506 (D. Vt. 2004), *aff'd*, 437 F.3d 251 (2d Cir. 2006)) (internal quotation marks omitted).

Defendant Elmore, having spoken with Ms. Tegroen, approached plaintiffs' residence at approximately 10:30 p.m. to mediate the ongoing dispute between Lingo and Tegroen. Decl. of Kenneth S. Montoya 16–17, ECF No. 38. Tegroen's residence, although located immediately to the north of plaintiffs' property, faced eastward, accessible only by the unnamed street running to

12 – OPINION AND ORDER

the east of both properties. Elmore, rather than walking around the block,[4] walked immediately to plaintiffs' property. *See* Decl. of Steven Elmore 3, ECF No. 37; Decl. of Steven Elmore 3, ECF No. 60. Elmore, noticing that the rear outside door light was on, proceeded upon plaintiffs' dirt driveway until he reached the door located within, but against the rear wall of the carport. *See* Decl. of Lia Lingo, ECF No. 58. Upon reaching plaintiffs' door, Elmore knocked. Decl. of Brian Michaels 4, ECF No. 33-1. Stephanie Moore, plaintiffs' acquaintance, answered the door and informed Elmore that "she did not live at the house and would get the owner." *Id*. Soon afterward, Lingo opened the door and came out of the residence, "agree[ing] to speak with [Elmore] in the car port next to the back door." *Id*.; Decl. of Kenneth S. Montoya 15, ECF No. 38.

Plaintiffs do not contend that Elmore's consensual encounter with Stephanie Moore and then Lingo, failed, thus requiring Elmore to "end the knock and talk and change [his] strategy." *Perea-Rey*, 680 F.3d at 1188 (quoting *United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008)). Rather, plaintiffs essentially argue that Elmore's presence at the back door was not "objectively reasonable as part of a knock and talk." *Id*. This Court agrees.

Plaintiffs' back door, located within plaintiffs' carport, was arguably "readily accessible from a public place, like the driveway . . . here." *Garcia*, 997 F.2d at 1280; *see also* Decl. of Steven Elmore 3, ECF No. 60 (indicating that Tegroen informed Elmore that most of the traffic into Lingo's residence was through the rear door). Defendants' reasonableness argument is further strengthened by the fact that plaintiffs' "rear outside door light was on" when Elmore approached, Decl. of Brian Michaels 4, ECF No. 33-1, and by the layout of the neighborhood,

---

[4] To reach plaintiffs' front door, defendant Elmore would have needed to walk north along the unnamed street until he reached Lee Street. At Lee Street, Elmore would have turned west and walked past Tegroen's home and a corner home until he reached 25th street. At 25th Street, Elmore would have walked past the corner home and reached plaintiffs' front door.

13 – OPINION AND ORDER

*see supra* note 4. Yet, these factors represent only part of the story. Timing and visibility are also critical factors.

Defendant Elmore's incursion into the carport, did not occur "at high noon." *See Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964), *overruled in part by Perea-Rey*, 680 F.3d at 1187. Rather, Elmore first entered plaintiffs' carport at approximately 10:30 p.m. To the extent that an uninvited visitor, "whether . . . a pollster, a salesman, or an officer of the law[,]" could lawfully have entered plaintiffs' carport during the *day*, that issue is not before this Court. *Davis*, 327 F.2d at 303. Defendants entered plaintiffs' carport late into the evening. *See, e.g.*, *Hammett*, 236 F.3d at 1056, 1059 (upholding officers' entrance into defendant's curtilage occurring at approximately 9:30 a.m.); *United States v. Cormier*, 220 F.3d 1103, 1107, 1109 (9th Cir. 2000) (upholding knock on defendant's motel room *front* door at approximately 8:00 p.m.). This factor, combined with various considerations limiting door visibility, e.g., plaintiffs' door was located at rear of carport, plaintiffs' rear outside light was *outside* of the carport, plaintiffs stored various household items in the carport, and plaintiffs' automobile and trailer were parked in front of the carport, make defendants' decision to enter the carport objectively unreasonable. *See* Decl. of Dugan 1–3, ECF No. 32-2 (photographs of carport). An uninvited private citizen, let alone a Girl Scout or trick-or-treater, would not objectively and reasonably believe that plaintiffs had given "leave (even implicitly)" to enter the carport under such circumstances. *Jardines,* 133 S. Ct. at 1416.

## ii. Defendants' Detection of Marijuana

Defendants Elmore and Carney unlawfully entered plaintiffs' carport. *See supra* § II(A)(i). From this unlawful vantage point, they smelt what they perceived to be marijuana emanating from plaintiffs' home. Decl. of Steven Elmore 4, ECF No. 37; Decl. of Brian Michaels 2, ECF

14 – OPINION AND ORDER

No. 45-4. Because defendants were not standing at a lawful vantage point, their perception does not constitute a mere observation of a smell "already in plain view." *Horton v. California*, 496 U.S. 128, 132 (1990) (citations omitted). In order to perceive the marijuana, defendants had to unlawfully enter plaintiffs' protected curtilage. Thus, defendants' perception of the marijuana constitutes an unreasonable search because the observation itself involved an invasion of privacy. *See*, e.g., *Garcia*, 997 F.2d at 1280 ("By standing [at a *lawful* vantage point], the officers did not make an unlawful entry or conduct an unlawful search" when they "look[ed] through the mesh screen door" and saw defendant carrying a kilo-sized package. (emphasis added)); *see also Jardines*, 133 S. Ct. at 1415 (noting "an officer's leave to gather information is sharply circumscribed when he steps off those [public] thoroughfares and enters the Fourth Amendment's protected areas").

## B. Seizure of Plaintiff Lingo

The issue before this Court is whether defendants unlawfully seized Lingo. First, this Court must determine whether the exclusionary rule applies in these circumstances. Second, this Court must determine whether defendants had probable cause to believe that Lingo endangered the welfare of her minor children.

### i. Application of the Exclusionary Rule in § 1983 Cases

Plaintiffs contend that defendants' alleged probable cause to arrest was based in substantial part, if not completely, on illegally procured evidence. Plaintiffs concede that recent non-precedential case law cuts against their position, but contend that such cases are generally "premature" or are distinguishable. Pls.' Supplemental Mem. 5, ECF No. 71. This Court is not persuaded.

15 – OPINION AND ORDER

"[T]he Fourth Amendment's exclusionary rule[5] applies to statements and evidence obtained as a product of illegal searches and seizures. Evidence obtained by such illegal action of the police is 'fruit of the poisonous tree,'[6] warranting application of the exclusionary rule[.]" *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (citations omitted). "[T]he 'prime purpose' of the[se] rule[s], if not the only one, 'is to deter future unlawful police conduct.'" *United States v. Janis*, 428 U.S. 433, 446 (1976) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). "In sum, the[se] rule[s] [are] . . . judicially created remed[ies] designed to safeguard Fourth Amendment rights generally through [their] deterrent effect, rather than a personal constitutional right of the party aggrieved." *Calandra*, 414 U.S. at 348.

However, the consensus of the case law is that neither the exclusionary rule nor the fruit of the poisonous doctrine apply to § 1983 cases. While the Ninth Circuit has not expressly addressed this issue, other circuit courts have held that neither apply to § 1983 claims. *See Hector v. Watt*, 235 F.3d 154, 159–60 (3rd Cir. 2000) (declining to extend the exclusionary rule to a § 1983 claimant); *Townes v. City of N.Y.*, 176 F.3d 138, 149 (2d Cir. 1999) ("The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because . . . the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant."); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997) ("Exclusion of the evidence . . . on the basis that they had no legal right to search the vehicle . . . . would be inappropriate."). These Circuit opinions are

---

[5] In criminal procedure, the exclusionary rule is "[a] rule that excludes or suppresses evidence obtained in violation of an accused person's constitutional rights." Black's Law Dictionary 647 (9th ed. 2009); *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (holding that "all evidence obtained by searches and seizures in violation of the Constitution is . . . inadmissible in a state court").

[6] In criminal procedure, "[t]he rule that evidence derived from an illegal search, arrest, or interrogation is inadmissible because the evidence (the 'fruit') was tainted by the illegality (the 'poisonous tree')." Black's Law Dictionary 740 (9th ed. 2009).

16 – OPINION AND ORDER

consistent with district court opinions within the Ninth Circuit.[7] This Court, consistent with the case law cited, finds that first, "the local law enforcement official[s] [are] already 'punished' by the exclusion of the evidence in the state criminal trial." *Janis*, 428 U.S. at 448. Second, to apply the exclusionary rule here would "not result in appreciable deterrence," *Janis*, 428 U.S. at 454, but would merely deprive this Court (or jury) of the underlying context in this civil case, *see Calandra*, 414 U.S. at 351 ("Whatever deterrence of police misconduct may result from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal."). Accordingly, this Court finds that defendants' unlawful entry into plaintiffs' carport and subsequent detection of marijuana do not vitiate defendants' probable cause to arrest.

## ii. Probable Cause Analysis

"[A] warrantless arrest by a law officer is reasonable under the Fourth amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe 'that the suspect has committed, is committing, or is about to commit an offense.'" *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

---

[7] *See, e.g., Smith v. Kelley*, No. C11-623RAJ, 2013 WL 5770337, at *12 (W.D. Wash. Oct. 24, 2013) (compiling a list of district court opinions); *Lindsey v. Wyatt*, No. 02:10-cv-01437-HZ, 2013 WL 2319324, at *6 (D. Or. May 27, 2013) (finding that "all of the evidence seized from Plaintiffs' residence is admissible to determine whether Defendants had probable cause to arrest even if the seizure of that evidence was caused by an allegedly unlawful search."); *Willis v. Mullins*, 809 F. Supp. 2d 1227, 1234–35 (E.D. Cal. 2011) ("the fact that Defendants' initial entry into the hotel room was a Fourth Amendment violation does not require suppression[.]"); *Radwan v. Cnty. of Orange*, No. SACV08-0786 AG (ANx), 2010 WL 3293354, at *11 (C.D. Cal. Aug. 18, 2010) (declining to rely "on earlier constitutional violations and the doctrine of the fruit of the poisonous tree to support a finding that the search of the vehicle was a separate constitutional violation."); *Boese v. Slaughter*, No. CV 05-28 GFSEHRKS, 2007 WL 1071924, at *3 (D. Mont. Mar. 5, 2007) ("The exclusionary rule, however, does not apply in cases filed under 42 U.S.C. § 1983[.]" (citations omitted)).

Plaintiff Lingo was arrested without warrant outside of her home on or about June 13, 2010, for endangering the welfare of a minor, ORS § 163.575. ORS § 163.575 provides in relevant part:

> (1) A person commits the crime of endangering the welfare of a minor if the person knowingly . . . .
>
> > (b) Permits a person under 18 years of age to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted . . . .

In Oregon a "controlled substance" is defined as:

> (a) . . . [A] drug or its immediate precursor classified in Schedules I through V under the federal Controlled Substances Act, 21 U.S.C. 811 to 812, as modified under ORS 475.035.

ORS § 475.005(6). The Controlled Substances Act, 21 U.S.C. § 812(c), classifies marijuana ("Tetrahydrocannabinols") as a controlled substance under Schedule I. OAR 855-080-0022, issued pursuant to ORS § 475.035, modifies the classification of "Marijuana" for purposes of Oregon law from Schedule I to Schedule II. Thus, this Court looks to the lawfulness of activity involving marijuana.

ORS § 475.864 makes it "unlawful for any person knowingly or intentionally to possess marijuana." However, the "Oregon Medical Marijuana Act authorizes persons holding a registry identification card to use marijuana for medical purposes . . . . [and] exempts those persons from state criminal liability for . . . possessing marijuana provided that certain conditions are met." *Emerald Steel Fabricators, Inc. v. Bureau of Labor & Indus.*, 348 Or. 159, 161 (2010) (citations omitted). At the time of arrest, defendant Elmore "conducted a records check through WEBLEDS and determined Lingo d[id] not have a medical marijuana card and the location

18 – OPINION AND ORDER

[was] not a registered grow site." Decl. of Brian Michaels 5, ECF No. 33-1; *see also* Pl.'s Mem. in Resp. to Defs.' Mot. Summ. J. 12, ECF No. 44.

Defendant Elmore, from plaintiffs' carport, *see supra* § II(A)(ii), smelt what he "recognized" as marijuana "[b]ased on [his] training and experience" emanating from Lingo's home and "noticed . . . two small children," Decl. of Brian Michaels 4, ECF No. 33-1. At that time, Elmore had been a police officer for about nineteen years, received specialty training in the detection of narcotics, and personally participated in warrant executions related to narcotic crimes. *Id*. at 3–4; *see also United States v. Arrellano-Rios*, 799 F.2d 520, 523 (9th Cir. 1986) ("The experience of a trained law enforcement agent is entitled to consideration in determining whether there was probable cause."). During Elmore's subsequent conversation with Lingo, she identified her two minor children, V.R.S. and J.P.L., and stated that the odor smelt by Elmore was being emanated from a "[hemp] incense she purchased from a local store." Decl. of Brian Michaels 5, ECF No. 33-1; Decl. of Kenneth S. Montoya 17–21, ECF No. 38; Decl. of Kenneth S. Montoya 2, ECF No. 50-1 ("And [Lingo] said, I'm burning incense.").

Approximately one hour after Elmore's initial arrival at plaintiffs' home, defendant Carney arrived. Decl. of Kenneth S. Montoya 20, ECF No. 38. Carney, having arrived at the scene, also smelt what he believed to be fresh marijuana emanating from plaintiffs' residence. Decl. of Brian Michaels 5, ECF No. 33-1; Decl. of Brian Michaels 2, ECF No. 45-4. Collectively, these circumstances are sufficient to warrant a prudent person to believe that Lingo knowingly permitted her minor children to remain in a place where unlawful activity involving marijuana (e.g., possession) was maintained or conducted. *See United States v. Kerr*, 876 F.2d 1440, 1445 (9th Cir. 1989) (noting that "the presence of the odor of contraband may itself be sufficient to establish probable cause" (citations omitted)); *United States v. Barron*, 472 F.2d

19 – OPINION AND ORDER

1215, 1217 (9th Cir. 1973) ("[T]he fact that an agent familiar with the odor of marijuana,

smelled such an odor emanating . . . alone was sufficient to constitute probable cause . . . ."

(citations omitted)); *see also United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) ("It is

well settled that the smell of marijuana alone, if articulable and particularized, may establish . . .

probable cause." (citations omitted)); *State v. Derrah*, 191 Or. App. 511, 518 (2004) (finding that

the "scent of marijuana, emanating from a residence, without more, is sufficient to support a

conclusion that marijuana will likely be found inside that residence" (citing *State v.

Rein/Jungwirth*, 324 Or. 178, 182 (1996)). Accordingly, because probable cause existed,

defendants are GRANTED summary judgment on plaintiffs' False Arrest count. *See Dubner v.

City & Cnty. of S.F.*, 266 F.3d 959, 964–65 (9th Cir. 2001) ("A claim for unlawful arrest is

cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was

*without probable cause* or other justification." (citing *Larson v. Neimi*, 9 F.3d 1397, 1400 (9th

Cir. 1993) (emphasis added)).

### III. Interference with Familial Relationship

Plaintiffs assert a count alleging "Interference [w]ith Familial Relationship." Pls.' Second

Am. Compl. 7, ECF No. 8. Pursuant to this count, plaintiffs allege that defendants deprived them

of their "first, fourth, and fourteenth amendment rights" because "the[ir] [actions] constituted an

'unwarranted interference' with the rights of all of the Plaintiff's family to familial

association[.]" *Id*.

"Parents and children have a well-elaborated constitutional right to live together without

governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 1999) (citations

omitted). "That right is an essential liberty interest protected by the Fourteenth Amendment's

guarantee that parents and children will not be separated by the state without due process of law

20 – OPINION AND ORDER

except in an emergency." *Id*. at 1136–37 (citations omitted). "Moreover, the First Amendment protects those relationships, including family relationships, that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs, but also distinctively personal aspects of one's life." *Lee v. City of L.A.*, 250 F.3d 668, 685 (9th Cir. 2001) (citing *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987)) (internal quotation marks omitted).

"Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of intrusion is reasonably necessary to avert that specific injury." *Wallis*, 202 F.3d at 1138 (citations omitted); *see also* ORS § 419B.150(1)(a) ("When the child's condition or surrounding reasonably appear to be such as to jeopardize the child's welfare[.]"). Put differently, "'[u]nwarranted state interference' with the relationship between parent and child violates substantive due process." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 441 (9th Cir. 2010) (quoting *Smith v. Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987)), *overruled on other grounds*, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999)).

Defendants Elmore and Carney arrived at Lingo's residence on June 13, 2010. At that time, six persons were at the residence, including: Lingo; V.R.S.; J.P.L.; Stephanie Moore; Moore's husband Dan; and Moore's child J.M. Decl. of Brian Michaels 5, ECF No. 33-1; Decl. of Kenneth S. Montoya 19, ECF No. 38. Elmore and Carney subsequently "cleared the house of its occupants including adults and children," Pls.' Second Am. Compl. 4, ECF No. 8, and arrested Lingo for endangering the welfare of a minor, *supra* § II(B)(ii). Defendant Carney then placed V.R.S. and J.P.L. with their great aunt Ruth under DHS supervision. *See* Decl. of Kenneth

21 – OPINION AND ORDER

S. Montoya 28–29, ECF No. 38. "After eight days, the children were returned to their home and their mother[.]" Pls.' Second Am. Compl. 4, ECF No. 8; *see also* Decl. of Brian Michaels 1–8, ECF No. 45-2 (DHS report).

This Court is not being asked to consider whether Lingo's arrest and the subsequent seizure of J.P.L. and V.R.S. were either wise or represented a good use of public resources. Rather, this Court assesses whether these actions were *lawful*. ORS § 419B.150 authorizes an officer to take a child into protective custody "[w]hen the child's condition or surroundings reasonably appear to be such as to jeopardize the child's welfare[.]" *See also State ex rel. Juvenile Dept. of Multnomah Cnty. v. J.D.*, 214 Or. App. 251, 259 (2007) ("[T]he key inquiry is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." (citations omitted)). Defendants, having arrested Lingo for endangering the welfare of her two children, *supra* § I(B)(ii), determined that leaving V.R.S. and J.P.L. at Lingo's residence unsupervised jeopardized their welfare. Even without considering the risk, if any, posed by marijuana paraphernalia (e.g., bongs, etc.), "there is no question that leaving [V.R.S. and J.P.L.] alone in the home was not a viable option." *Debiaso v. Spitz*, 957 F. Supp. 2d 1213, 1219 (D. Or. 2013). At that time, "V.R.S. was 11 years old and J.P.L. was 7 years old." Defs.' Mem. in Supp. Summ. J. 13, ECF No. 36. Leaving two young children unsupervised for an indeterminate amount of time "reasonably appear[ed] . . . to jeopardize [their] welfare." ORS § 419B.150; *see also Curow-Ray v. City of Tumwater*, No. C09–5633RJB, 2010 WL 3222505, at *10 (W.D. Wash. Aug. 12, 2010) (finding that the report of a 11-year old child that she and her 6-year old brother "were left home alone frequently until 10:00 p.m., and they sometimes put themselves to bed without their parents being home[,]" was "compelling evidence" in justifying placement of the children in protective custody.). Likewise, these circumstances "provide[d]

22 – OPINION AND ORDER

reasonable cause to believe that the child[ren] [were] in imminent danger of serious bodily injury," *Wallis*, 202 F.3d at 1138 (citations omitted), and "warranted" defendants' removal action, *see Crowe*, 608 F.3d at 441. Accordingly, defendants are GRANTED summary judgment on plaintiffs' Interference with Familial Relationship count. *See DeBiaso*, 957 F. Supp. 2d at 1219 (finding "[n]o reasonable juror could dispute that the circumstances facing Defendant provided reasonable cause to believe C.D. was in danger if not taken into custody").

## IV. Plaintiffs' *Monell* claims

Plaintiffs, in reliance upon deposition testimony taken from Elmore, contend that the City of Salem failed to properly train its police officers, resulting in constitutional violations.[8] *See* Pls.' Second Am. Compl. 6, 8–9, ECF No. 8; Pl.'s Mem. in Resp. to Defs.' Mot. Summ. J. 13–15, ECF No. 44. Although this Court found Lingo's arrest and the subsequent seizure of V.R.S. and J.P.L. lawful, a brief assessment of plaintiffs' *Monell* claims[9] remains informative. *See also Orin v. Barclay*, 272 F.3d 1207, 1217 (9th Cir. 2001) ("A § 1983 action against a city fails as a matter of law unless a city employee's conduct violates one of the plaintiff's federal rights.").

"To impose liability on a local government for failure to adequately train its employees, the government's omission must amount to 'deliberate indifference' to a constitutional right." *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). "This standard is met when 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said

---

[8] Plaintiffs' *Monell* claims include: (1) a count alleging violation of substantive due process under a broader False Arrest claim for relief, and (2) a count alleging violation of substantive due process under a broader Interference with Familial Relationship claim for relief. *See* Pls.' Second Am. Compl. 6–9, ECF No. 8.

[9] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

to have been deliberately indifferent to the need.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

"To succeed, a § 1983 plaintiff must show that there is a direct link between the city policy and the constitutional violation." *Mackinney v. Nielsen*, 69 F.3d 1002, 1010 (9th Cir. 1995) (citing *City of Canton*, 489 U.S. at 385). "The plaintiff can show this link by proving that the policy itself is unconstitutional or that the city made a 'deliberate' or 'conscious' choice to fail to train its employees adequately." *Id.* (citations omitted). Plaintiffs identify two alleged training deficiencies, including: (1) improper reporting of investigatory facts and (2) improper understanding as to fourth amendment curtilage protections.

As to improper reporting, plaintiffs turn to Elmore's deposition. That deposition, in relevant part, provides:

> [Elmore]: I guess I don't understand . . . the road you're trying to take me down. When I write my reports up when I conduct an investigation, *all my investigational facts or details are in my report* which establishes the elements of the crime which gives me PC to make the arrest. If I don't develop . . . probable cause to make the arrest. I won't make the arrest and all that will be documented in my report.
>
> [Plaintiffs' Counsel]: So what I heard you say in different words is I only include that information which assists me in developing PC to arrest a suspect. Is that what you meant to say?
>
> [Elmore]: I thought that's what I said.

Decl. of Brian Michaels 2, ECF No. 45-3 (emphasis added). Plaintiffs interpret Elmore's statements to mean that he was "trained to include only inculpatory information." Pl.'s Mem. in Resp. to Defs.' Mot. Summ. J. 13, ECF No. 44. Even to the extent that this interpretation is credited, these statements are not relevant to the claims before this Court, i.e., false arrest and interference with familial relationship. Moreover, plaintiffs make no mention of "exculpatory"

facts omitted by either officer. Thus, even had this Court found an asserted constitutional

violation, this testimony would have been insufficient to meet plaintiffs' burden at this stage in

the proceeding. *See, e.g.*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007)

("[E]vidence of the failure to train a single officer is insufficient to establish a municipality's

deliberate policy."); *Boyd v. Benton Cnty.*, 374 F.3d 773, 784 (9th Cir. 2004) ("[Plaintiff] cannot

survive summary judgment on her Monell claim by simply relying on the lack of a written

policy.");

       As to plaintiffs' curtilage protections, plaintiffs again return to Elmore's deposition. That

deposition, in relevant part, provides:

> [Plaintiffs' Counsel]: Right. And as part of your training . . . have you been
> trained that one can go up to the front door of a house but nowhere else?
>
> [Elmore]: Not specifically. . . .
>
> [Plaintiffs' Counsel]: And City of Salem, when they trained you, essentially
> they said you can go wherever you want on the property?
>
> [Elmore]: Well, they didn't leave it that broad either.
>
> [Plaintiffs' Counsel]: What did they say?
>
> [Elmore]: Well, I don't think we - - I don't recall specifically being trained
> to specifically go to doors and then which door.
>
> [Plaintiffs' Counsel]: Okay. So why is that different than you can go
> wherever you want on the property? What did they tell you that would make
> that not true . . . . So what were the restrictions?
>
> [Elmore]: Well, I only say that because I don't think we've ever had specific
> training. I mean, we've talked about training about like no trespassing signs,
> you know, properly marked property. *I don't recall ever having specific
> training that when we go to calls we specifically go to the front door.*

Decl. of Brian Michaels 4–5, ECF No. 45-3 (emphasis added). Plaintiffs emphasize defendants'

lack of door-specific training: "have you been trained that one can go up to the front door of a

25 – OPINION AND ORDER

house but nowhere else." *Id*. at 4. However, as indicated in *Perea-Rey*, that is a misstatement of the law. Police officers "need not approach only a specific door . . . . [but] may approach any part of the building . . . where uninvited visitors could be expected." 680 F.3d at 1188. Because this curtilage testimony does not evidence inadequate training and is not relevant to the claims before this Court, this testimony would also have been insufficient to meet plaintiffs' burden at this stage in the proceeding. Accordingly, defendants are GRANTED summary judgment on both of plaintiffs' *Monell* counts.

## CONCLUSION

For these reasons, plaintiffs' motion for partial summary judgment, ECF No. 30, is GRANTED IN PART and DENIED IN PART, and defendants' motion for summary judgment, ECF No. 35, is GRANTED.


IT IS SO ORDERED.


DATED this 3rd day of April, 2014.


_____s/Michael J. McShane_____
**Michael J. McShane**
**United States District Judge**